EXHIBIT

4

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION


FRANK JOSEPH SCHWINDLER,        :
                                :
        Petitioner,             :
                                :
   v.                           :
                                :   CASE NUMBER 4:16-CV-00189
P.O. AHMED HOLT,                :
                                :
        Respondent.             :
_____


MOTION FOR APPOINTMENT OF COUNSEL
(HELD VIA VIDEOCONFERENCE)

BEFORE THE HONORABLE CHRISTOPHER L. RAY
United States Courthouse Annex - Hearing Room
124 Barnard Street
Savannah, Georgia
October 28, 2021


TRANSCRIBED BY:  Victoria L. Root, CCR
                 United States Court Reporter
                 Post Office Box 312
                 Meldrim, Georgia  31318
                 (912) 650-4066

Proceedings recorded by FTR.  Transcript subsequently produced
by mechanical stenography and computer-aided transcription.

2

A P P E A R A N C E S


FOR THE PETITIONER, PRO SE:

    FRANK JOSEPH SCHWINDLER, 323208, A-2
    Phillips State Prison
    2989 West Rock Quarry Road
    Buford, Georgia   30519-4118


FOR THE RESPONDENT:

    PAULA K. SMITH, Esquire
    Office of the Attorney General
    Department of Law - 03
    40 Capitol Square, S.W.
    Atlanta, Georgia   30334
    (404) 458-3288

3

P R O C E E D I N G S

(Proceedings called to order at 9:13 a.m.)

THE COURT:  All right.  Ms. Davenport, if you would, please call the case.

COURT CLERK:  4:16-CV-189, *Frank Joseph Schwindler v. P.O. Ahmed Holt.*

THE COURT:  All right.  We are here this morning on the record in the matter of *Schwindler v. Holt* on the petitioner's motion for appointment of counsel.

I will note for the record that this hearing is being conducted by videoconference.  The petitioner, Mr. Schwindler, is present.  Ms. Paula Smith, counsel for the attorney general's office, is present on behalf of the respondent.

In addition to the petitioner's motion for appointment, the respondent did file a response, which is filed at Docket Entry 81, and the petitioner filed a reply at Docket Entry 83.  Thus, it would appear that the petitioner's motion is ripe for consideration, and that's why we're having this hearing this morning.

In looking at the body of Mr. Schwindler's motion, specifically at Docket Entry 79 on Page 5, Mr. Schwindler has made this request in the alternative.  He requests either, as his primary relief, the appointment of counsel to represent him in this habeas corpus matter going forward or, in the alternative, for an extension of time in which the petitioner

4

would be permitted to still file his reply to the answer that was submitted by the respondent in this case.

And it goes on to provide a number of specific conditions that Mr. Schwindler thinks would be necessary in terms of providing him with adequate access both to the record in this case but also to legal resource materials that he needs in order to advance his cause.

The respondent's position with regard to that request is that the respondent apparently does not oppose the appointment of counsel in this case.  It also does not oppose additional time in which Mr. Schwindler may submit his reply, but the respondent does deny or take issue with any suggestion that there are any due process concerns with the state of the record or access to the record up to this point.

Ms. Smith, is that a fair characterization of where we stand at this point?

MS. SMITH:  Yes, Your Honor.

THE COURT:  All right.  Mr. Schwindler, do you agree?

MR. SCHWINDLER:  Yes, sir.  That's about where we're at.

THE COURT:  All right.  So, Mr. Schwindler, this is your motion, so I'd like to start with you first, if I could. And the first relief you've asked for is for the appointment of counsel in this case to assist you.

In looking at your reply brief in particular, I think

5

you kind of got it down to a very simple, succinct statement on Page 7 of that reply brief.  I'm going to read to you what you wrote, and then I thought we'd talk about that from there.

You said that Petitioner has vigorously sought to represent himself; therefore, it should be easy for the Court to understand that the only reason Petitioner has moved for appointment of counsel is that he has gotten worn down by the inability of any court to truly resolve the due process problems which have plagued this case from the beginning and has concluded that the only way forward is with counsel.

I was wondering if we could start with that topic in particular, Mr. Schwindler.  Tell me precisely what you believe the due process problems are in the case and why you think counsel would be necessary to help rectify or solve that situation.

MR. SCHWINDLER:  Yes, sir.  I think what -- I think what the due process problem is is exactly what the Eleventh Circuit said it is, and I think it's a function of the system.  Ms. Smith has sent reams and reams and reams of things to me; the courts have sent reams of things to me; and the prison system loses it.

A very good example is Ms. Smith sent stuff to me in August of this year.  The warden talked to me on August the 24th and told me that I would have access to it and that he would check on the problem with the computers and that he would

6

then set up for me to have at least 2 hours every week to go print this.

Well, I've still not been to the law library because we have a problem getting to the law library because of the fact we don't have staff. The warden today is trying to shuffle people so that he's got staff.

About a month ago was the last time I -- well, the only time I was actually able to see the materials that Ms. Smith sent me, and Unit Manager Thomas had me spend 2 hours going through those boxes and making sure exactly what we had and what we're still missing.

So the former property officer and I went to the property room, went through everything in the property room, and they have lost all of the paper copies that Ms. Smith sent 3 years ago with regard to the two extra discs that were introduced in the habeas case.

So we keep doing the same thing. And it's one of these things where no matter how hard we try -- and the warden has tried to work with me, and Ms. Smith has tried to provide the information that we need. But the system itself, particularly with COVID and with the staff shortages and with the change of the way the computers work in the prison system, they've gotten to the point where it's just flat impossible to sit -- this is what I have. All the materials we have in this case with thousands and thousands of pages, this is what I

7

have.

I have a restriction on what I can have in the room. I can't go to the ID room/property room and sit in the ID room/property room to work. I can't take the stuff to the law library because we don't have a law librarian. And they haven't had a law librarian for close to 2 years now.

It is -- it's to the point where I no longer even remember where things are at within my own record because I haven't seen most of them to be able to actually read them for going on 2 and a half years now. And it's -- it is -- I believe it's a function of the way the system is suffering right now and the function of COVID, and I don't see it moving anywhere anytime in the near future.

THE COURT: All right. Let me note for the record that when Mr. Schwindler makes the statement this is what he has, he's holding up a single file folder that's probably about 2 inches thick at most.

MR. SCHWINDLER: It is two.

THE COURT: All right. Two file folders about 2 inches thick.

MR. SCHWINDLER: One has got the petition in it, and one has got the very most recent documents.

THE COURT: So, Mr. Schwindler, let me -- I think there's something implied in what you told me, but I just want to make sure that it's expressed.

8

Your pleadings make clear to me that you have been actively and thoughtfully engaged in the process of trying to challenge your convictions through multiple forums on your own -- on your own direction and at your own hand over the last decade to two decades.

You've articulated, I think, clearly and cleanly more than a dozen particular defects that you contend took place in your criminal prosecution in the state system.  You articulated those at the trial level.  You've articulated them from the appellate level.

You have been your own lead counsel, for lack of a better term, through the state habeas process in Hancock County, through the state habeas process in Gwinnett.  You were your own pro se litigant for a companion 1983 claim which you filed in the Northern District of Georgia, and you have led your own charge, as it were, in this case.

Am I correct in assuming that you don't feel you need a lawyer for purposes of advancing the merits of the claims that you're trying to bring forward but, rather, it is solely on this issue of whether there's a due process impediment, and you need a lawyer to assist you in the role of gathering the entire record, ensuring that it is complete, and ensuring your access to it?  Is that a -- is that fair?

MR. SCHWINDLER:  I no longer think that's fair because I can't do the legal research that I need to do.  I

9

can't find current cases.  The most recent access that I had to a computer to do case -- case law research and Shepardizing is over 2 years ago.  And, again, this -- these things change, and I can't keep up with it.  And I'm no longer able to keep up with it, and I'm no longer even able to keep up with the threads of where I was going with what was going on.

And I -- you know, it is hard for me to admit that I just can't do it anymore.  And I don't even think I can make -- I don't even think I can make some of the arguments that I need to be able to make.  I'm just -- I'm not there anymore.  And, again, I've had COVID long ago, but it's just, you know, (indiscernible) with the rest of it.

THE COURT:  Now, Mr. Schwindler, the lack of access to legal resources that you've made reference to in your petition --

And, obviously, Ms. Smith, I'll -- I will, of course, have an opportunity to hear from you as well today.

But in terms of these access issues, if these access issues to legal research and legal research materials were remedied, do you not think that would put you on a footing in which you could still advance your cause?

MR. SCHWINDLER:  There's so -- so much paperwork that -- it's like this.  I'm in a prison where I've got to be in this building.  I can't have the paperwork in the building.  So if I'm going to do the research, I need to have the papers

10

so that I can refer to what I've got there so that I can look at the computer to see what is on the computer which applies to that and what -- trying to find the materials that are within the record that match the points that are in the petition and then trying to take that and turn it into a legal argument.

All of these are in different locations.  And unless they were going to provide me a law office somewhere or a little table somewhere in the law library, I just don't see this happening.

It's -- previously, I used to have -- I used to work at the institution.  Back when I was doing the habeas in Gwinnett County, I actually worked in the law library, so I had access to be able to do that.  And the law librarian actually held the electronic versions of the files so that all I had to do was get those from her, and then I could put them into the computer and read them off that, and then I could go back and forth.

I can't do that anymore because the computers don't read the stuff anymore.  So that means I have to work with actual paper.  And when I have to work with actual paper, I'm dealing with -- at one point, I had five boxes that were that big of paper.  It's just -- it's a -- it's a nightmare.

And to be able to take that, then, and make any sense out of it -- if you only get an opportunity to go sit there 2 hours a week, when am I going to have the paper, and when am

11

I going to be able to do that, because they don't have anybody in ID to do that?

And they don't have any ability for me to take it into the -- my room because that's a fire hazard, and I don't have the ability to put it in the law library because they don't have a law librarian. So all the things that have been able to be worked over the years no longer exist partly because of COVID. That's where I'm at.

So I don't really think that -- if I had the amount of time that I used to have when I worked in the law library or the amount of time that I used to have when I had access to a computer working for the chaplain, I don't think that I have the ability mentally to do this anymore. I just can't keep up with all these things anymore, and I can't remember what's over here and what's over there, what is in what volume.

I know that on one of the -- when I did my initial work with the habeas in Gwinnett County, I had a logbook, and the logbook shows everything by the numbers on the discs that Ms. Smith gave me so that I had the numbers cited through the pages on the disc. I don't have that anymore. I can't use the disc any more. Ms. Warren still has the disc, but we can't use it because the computers don't read it.

And I just don't know -- I really just don't know how I could do it, and I -- physically, I don't believe that the prison system, at this point, is capable of doing it.

12

THE COURT:  Mr. Schwindler, I'm going to ask you some questions that are of a personal nature.  If you wish to decline to answer them, you can.  But if you do answer them, it may help me understand your circumstance better.  I specifically want to ask you some questions about your health and your mental acuity, if I could.

You are 75 years of age; is that correct?

MR. SCHWINDLER:  Yes, sir.

THE COURT:  And you have had some general health problems.

Can you recount those for me, please.

MR. SCHWINDLER:  I've had three heart attacks.  I have an artificial neck where I broke my neck and they replaced a third of my neck.  I was one of the very first people that got COVID, and then I got long COVID, so there's days that I'm just in a fog and, like, (indiscernible).  I just had real problems.

I have never stumbled around -- and I think Ms. Smith will tell you.  I don't normally have a problem finding what words I want to use.  I regularly don't even remember what words to use anymore.  I don't know whether I'm in the early stages of dementia or what, but I know that I just don't have it anymore.

THE COURT:  Mr. --

MR. SCHWINDLER:  I mean, you know --

13

THE COURT: Mr. Schwindler, when did you first contract COVID?

MR. SCHWINDLER: March of last year.

THE COURT: Okay. And this fog to which you make reference, was it present, in your mind, when you made these submissions that you turned in to the Court, your petition and your reply?

MR. SCHWINDLER: I don't really recall. It's -- everything is a blur in the last 2 years. I have real good days, and I have real bad days. I have days that I don't want to wake up. It's just -- I don't know if you've had the COVID shot, but I had both the COVID shot and the first booster, and I slept, like, 20 hours after each of those. Well, that's the way I feel some days. And they tell me it's long COVID. I still have the cough periodically, so it's a come-and-go sort of thing.

THE COURT: Has any --

MR. SCHWINDLER: I can't explain it another way.

THE COURT: Has any healthcare professional at the prison given you any specific diagnosis that you suffer from some form of mental impediment of any kind?

MR. SCHWINDLER: No, sir. I don't think I'm -- that I've lost it completely. I'm just saying this, that given the hurdle of what I'm trying to get over and overcome, I'm just -- I'm at that point.

14

THE COURT: Mr. Schwindler, what is it that you hope and believe counsel could accomplish for you that you're unable to accomplish yourself?

MR. SCHWINDLER: I think they can -- having worked with this -- this case is so complex and has so many moving parts. I think they could Shepard them together and understand -- it's like when -- when I did the civil case and I appealed -- the Northern District initially granted summary judgment for the State, and I did a pro se appeal to the Eleventh Circuit.

The Eleventh Circuit appointed an attorney that immediately saw where I was going with it and was able to marshal the arguments that I was making and take what I was trying to do and take it to where it needed to go with the Eleventh Circuit.

And the Eleventh Circuit agreed with my basic argument, but she was the one that was able -- (indiscernible) McAllister was the one that was able to try to actually make it go forward. And I think that's what I need. I think I need -- I need an attorney.

THE COURT: Mr. Schwindler, what's the highest level of formal education that you've received?

MR. SCHWINDLER: I completed the doctorate in history.

THE COURT: At what institution?

15

MR. SCHWINDLER:  Auburn University.

THE COURT:  Okay.  What other degrees underneath the Ph.D. do you hold?

MR. SCHWINDLER:  A master's degree in political science.  And then, obviously, I had three bachelors in theoretical math, philosophy, and political science.

THE COURT:  At what institutions for those other degrees?

MR. SCHWINDLER:  All Auburn.  I started college being a professional Boy Scout in Missouri at Missouri Valley, and then the Navy sent me to William & Mary.  And then every time the Navy didn't know what to do with me, they sent me back to Auburn, and I went through those programs.

THE COURT:  Mr. Schwindler, as I know you know because I've seen it in some of your prior submissions, the appointment of counsel in a habeas corpus 2254 case is a rare event.  It is not -- it is not common.  It is not the norm.  That is to -- not to say it never happens, but it is certainly not a common occurrence.

It generally requires, as you know, that the case either be at some mechanical hearing stage where counsel are absolutely necessary -- that's one standard -- or, generally, some other extraordinary circumstance that it would be within the discretion of the Court to exercise -- to appoint counsel.

What is it about this case -- well, let me back up.

16

I think you would concede we're not at a mechanical hearing stage yet in this case.

Do you contend there is some extraordinary circumstance in this case? And if so, what would that be?

MR. SCHWINDLER: I think I've pretty well enunciated it. I think the extraordinary circumstance is the size and complexity of the case -- and, I mean, it is an extraordinarily complex case -- and just the reality of life in 2021 within the Georgia prison system and the reality of that with regard to me. It's . . .

Again, Ms. Smith sent two boxes of stuff, but there's still stuff missing. I can't get the stuff. I've got the two discs. Ms. Warren has got all the discs, but we can't print that many pieces of paper. I think it has just -- this is a circumstance I don't think any court ever even thought about.

I don't think that Congress ever thought that we were going to have a situation where it was going to be like this. I don't think the State of Georgia ever thought they were going to have a situation where their prisons had to switch people around all day and put lieutenants in buildings. And I don't see it happening -- changing anytime soon.

THE COURT: Mr. Schwindler, the --

MR. SCHWINDLER: I want this --

THE COURT: I'm so sorry, Mr. Schwindler. I cut you off. Finish -- please finish your thought.

17

MR. SCHWINDLER:  I want this case to get done.  I really want this case to get done.  I'd like to be alive when it gets done.  And I don't see it happening any other way.

THE COURT:  Mr. Schwindler, the responsive papers which have been submitted by the respondent as well as a recent notice of manual filing which the respondent provided to the Court certainly suggests to me that the attorney general's office, on behalf of the respondent, is engaged in a process of trying to make sure that it has marshaled what it thinks is a complete or at least adequate record in this case in the form of paper materials, which I understand have been delivered to the prison where you are located, and also reviewing the CD-ROM materials.

Do you -- are you able to articulate for me specifically -- and I realize that, you know, you may not have seen all of it, and maybe that makes it difficult to answer this question.

But what is it about the record that's currently physically present at the prison that you think is deficient or missing things?  Forget the issue of your access to it for a moment, but just -- can you tell me what's there and what's not there, or do you know?

MR. SCHWINDLER:  I can tell you sort of what's there. What I've got is I've got a gray lockbox that is that big by that big.  I guess that's 2 and a half feet by 2 feet and -- a

18

foot and a half.  And it is filled with paper with no breaks in it from one end to the other, with no rubber bands in it from one end to the other -- I don't know -- 15,000, 16,000 pieces of paper, and there's no order to it.

There's no way to put an order to it because I can't -- I can't put -- I can't -- people send things to me that are bound together, and they get unbound together.  And when you start talking thousands and thousands of pages, it's like -- every time you open it up, it's looking for the needle in the haystack.

What I do know is there is that -- the list that Ms. Smith had at the top of the boxes that listed 20 volumes. All 20 volumes are there.  What I know is missing and I know that they lost here that was stored underneath a stairwell somewhere in a corner in the property room -- they lost the box that had the papers that came from the two CD-ROMs that the federal court ordered to be produced during the course of the case on the legal files.

And that's all the materials from Alabama, and it's all the materials from -- that were necessary, things like -- I'll give you a specific example.  I was physically in a hospital in Alabama on the day that I was accused of molesting a kid in Columbus, Georgia.  The hospital records and the materials that support that were on those CD-ROMs.

I don't have those CD-ROMs anymore.  Well, Ms. Warren

19

does.  But I don't have the paperwork, and I don't have the certified copies of that.  And I believe that's relevant to the fact of whether or not the prior conviction that was used to enhance my sentence is valid.

THE COURT:  Mr. Schwindler, you've made several references over the course of the hearing today to Ms. Warren. It probably would be helpful to identify who she is for the record and her role.

MR. SCHWINDLER:  Ms. Warren is the warden's administrative assistant.  And when the very first CD-ROM from the Gwinnett County court was sent out here, it was given to me.  And then about 2 weeks later, someone made the decision to take the CD-ROM from me, and it was given to Ms. Warren to hold along with a USB device that had all the materials from the civil case from the case open records.  So both of those were given to Ms. Warren, and Ms. Warren holds those.

Whenever I would go to the law library -- once we no longer had a law librarian, we would have to request Ms. Warren to give those materials to someone to sign out to me, and then I would use them in the law library, and then I would turn them back in, and then they would go back to Ms. Warren.  So -- her name is Delores Warren, and she was the warden's administrative assistant.

THE COURT:  Now, obviously, Mr. Schwindler, you and counsel for the respondent likely know this record better than

20

anyone, including the Court, but let me make sure I understand. So you are saying that there were two CD-ROMs in particular that Ms. Warren had access to.

And what is your understanding as to what has happened to those two CD-ROMs which you tell me contained what you describe as the civil case?

That's the federal civil 1983 case?  Is that what you're talking about?

MR. SCHWINDLER:  Yes.  Yes, sir.

THE COURT:  And the Alabama records which you say were in the record of that case; is that correct?

MR. SCHWINDLER:  Yes, sir.

THE COURT:  What is it you --

MR. SCHWINDLER:  There are actually --

THE COURT:  Finish your thought.  I did not mean to interrupt you.  Go ahead.

MR. SCHWINDLER:  There are actually three CD-ROMs. The first CD-ROM is the one that the Gwinnett County court gave that I was, I believe, the materials that Ms. Smith introduced during the Hancock County case.  And that's the one that I believe has the 20 volumes of materials that was introduced way back when we were in Hancock County.

Now, the second CD-ROM was produced as part of the federal civil rights case.  And then the third CD-ROM was also produced as the -- as part of the federal civil rights case.

21

So there are actually three CD-ROMs.

I've got all the paper materials from the first CD-ROM.  That's what Ms. Smith just sent me again was the stuff from the first CD-ROM.  And this -- I used to have the paper copies from the second and third, but those have been lost, and Ms. Warren does not have the second and third CD-ROMs.  She's got the first CD-ROM.  Plus, she's got the original civil case up to where Ms. McAllister took it over.

THE COURT:  Now, just so -- just to make this clear as mud, Ms. Smith's responsive documents make reference to four -- she uses a numbering system about four CD-ROMs.

Are the four CD-ROMs that she's talking about part of the same three CD-ROMs you're talking about, or is that some different numbering system of a different set of the record?

MR. SCHWINDLER:  From what I read, I believe -- and I think Ms. Smith will correct me if I'm wrong.  I think that her four refer to the first one.  That first one had just thousands and thousands and thousands of pages on it.  When she came into the court, she had a dolly that she had to carry all this stuff with.

THE COURT:  So it is your --

MR. SCHWINDLER:  So --

THE COURT:  It is your contention that the four -- I'll let Ms. Smith speak for herself when I come to her, but it's your contention that when she makes reference to the four

22

CD-ROMs, this is limited to the record of the criminal prosecution in the state court and the appellate process in the state court and the Hancock habeas piece and the Gwinnett habeas piece; is that correct?

MR. SCHWINDLER:  I believe that is exactly what -- that's my understanding of what her four refers to.

THE COURT:  And you believe -- and although it's large and perhaps unwieldy, you believe you have the entirety of that in paper format at the prison that you have access to; is that correct?

MR. SCHWINDLER:  Yes, sir.  I believe that's here.

THE COURT:  Okay.

MR. SCHWINDLER:  I don't have access to it, but I believe it's here.

THE COURT:  Well, that are proximate to you.

And there have been discussions about you having access to those materials; is that fair?

MR. SCHWINDLER:  Yes, sir.

THE COURT:  Okay.  So now tell me about the materials that you refer to as CD-ROM 2 and CD-ROM 3 which -- you say Ms. Warren had the CD-ROMs at one time.  You had paper at one time.  And you now contend that you have neither.

MR. SCHWINDLER:  I do not believe that Ms. Warren had 2 and 3.  I believe the law librarian had them.  And we don't know where they went to.  Ms. Warren had CD-ROM 1, and she had

23

the USB for the civil case.

THE COURT:  Is the U- --

MR. SCHWINDLER:  Where CD-ROMs -- where CD-ROMs 2 and 3 went, I don't know.  Those were introduced by Ms. Smith into the Gwinnett case, but I don't see anything from those in the -- and I think she introduced them just as CD-ROMs.

THE COURT:  Now, when you make reference to the USB, let me ask:  Was the USB duplicative of something that was previously stored on CD-ROM, or is it some other different piece of the record?

MR. SCHWINDLER:  It's other different pieces of the record, and it is the stuff with regard to the due process problem of getting access to this and the Department of Corrections losing parts of this.  That was what the whole argument was is that -- I was transferred so many times, and different wardens would be cooperative, and others would not be cooperative, and then they would throw things out.

When I showed up at Valdosta, they deliberately dumped the record and kicked it around the parking lot. They -- these are just things that were in the Eleventh Circuit case that -- where the Eleventh Circuit case said, "No, guys. You've got to actually let him have access to the records."

And the State tried to get them.  It's not that the State has not been doing this.  It's that -- it's a function of how the prison system worked.

24

THE COURT:  How long have you been at Phillips, Mr. Schwindler?

MR. SCHWINDLER:  I've been here since 2013.  And they've been extremely cooperative here.

THE COURT:  When did you last have access to what you described as CD-ROM 2 and CD-ROM 3 or a version of the paper printouts of 2 and 3?

MR. SCHWINDLER:  When the appeal for the Gwinnett habeas was done, that is the last time I had access to those.  And --

THE COURT:  And that --

MR. SCHWINDLER:  -- since then, we -- that's, like, 2017, I think.

THE COURT:  So since you've been at Phillips, I guess is my point?

MR. SCHWINDLER:  Yes, sir.

THE COURT:  Okay.

MR. SCHWINDLER:  They've had two law librarians since I've been here, and they have not had one for several years now.

THE COURT:  And so -- I'm so sorry.  So the last time you had access to CD-ROM 2 and CD-ROM 3 or a paper version of them was about 2017; is that correct?

MR. SCHWINDLER:  Yes, sir.  Yes, sir.

THE COURT:  What do you understand happened to the

25

paper copies?

MR. SCHWINDLER:  Well, Ms. McGill, who was the property room officer but is no longer the property room officer because we don't have a property room officer anymore, when I was taken to look through the box that Ms. Smith sent, we could tell that we were missing the paper copies from 2 and 3.

So she took me into the ID room property room, and we looked through everything that was in there, and there was a -- more of -- sort of a cubbyhole that was up underneath some stairs.  And she opened that up, and I physically went in there, and we could not find any of the papers.

And what she assumed happened is that because of the fact nobody has been supervising it for at least 2 years and -- somebody decided -- sat it in the corner and said, well, it's trash, so off it goes.  We don't know.  I don't think anybody knows.

THE COURT:  And then, in a similar vein, when is the last time you had access to or saw CD-ROM 2 and CD-ROM 3, the CD-ROMs themselves?

MR. SCHWINDLER:  I have not seen them since 2017.

THE COURT:  Okay.  Now, this USB data storage device that you make reference to, you say this is something that was prepared by the respondent and put into evidence in the Gwinnett habeas hearing; is that right?

26

MR. SCHWINDLER:  No, sir.  The USB was prepared by (indiscernible) McAllister, and it had everything from the civil case from -- concerning the problems with the record and that she had all the pleadings and all the evidence from that, all the transcripts, the -- there were a couple hearings in that.  And that's what that had, because a lot of the materials and discussions, particularly about the stuff from Alabama, were in that particular case.  And that was something that was . . .

THE COURT:  Does that mean that the USB duplicated the contents of CD-ROM 2, the 1983 --

MR. SCHWINDLER:  No.

THE COURT:  -- case?

MR. SCHWINDLER:  No, sir, because it didn't actually have the materials in it.  That was what was being sought. CD-ROMs 2 and 3 are what were produced in response to the materials that had been lost previously by the Department of Corrections.

They gave us two different CD-ROMs.  They were supposed to produce another one, but they never did.  And the -- those were actual materials from outside of the -- that were -- never made it into my criminal case, never made it into the state habeas.  They were materials that had been sought but were not produced until the middle of the civil case.

THE COURT:  When did you last see or have access to

this USB storage device?

MR. SCHWINDLER:  2017.

THE COURT:  Okay.  So what we've discussed so far that I understand to be the entirety of -- or the -- it may not be.  You can correct me if I'm wrong.

But what I understand to be the complete universe of the potential record here would be covered by what is on CD-ROM 1, which is also duplicated by the paper material that's currently at Phillips, what's on --

MR. SCHWINDLER:  That's correct.

THE COURT:  -- CD- -- what's on CD-ROM 2, which is the 1983 related action from the Northern District of Georgia.

What's on CD-ROM 3?

MR. SCHWINDLER:  2 and 3 are both materials that were produced in response to the civil case in the Northern District.  The USB is what was the civil case.  So the USB is the case.  2 and 3 are what was responded to that.

THE COURT:  Does that represent, Mr. Schwindler, the entire universe of the material to which you would need access and give you your complete record to pursue your habeas claim here?

MR. SCHWINDLER:  Yes, sir.

THE COURT:  There are no other materials that you're aware of, then, outside CD-ROM 1, CD-ROM 2, CD-ROM 3, and the USB storage device; is that correct?

28

MR. SCHWINDLER:  That's correct.  That's what I used to be working with.

THE COURT:  All right.  Let me do this, if I may, Mr. Schwindler.  I've been hearing from the petitioner for a while, and I have not yet afforded the Department of Corrections an opportunity to be heard.  So let me -- let me pivot to Ms. Smith.  And I may have occasion to go back and forth today as this -- as this conversation goes on.

Ms. Smith, good morning.

MS. SMITH:  Good morning, Your Honor.

THE COURT:  Tell me the Department of Corrections' take on what the correct disposition for Mr. Schwindler's motion should be.

MS. SMITH:  As reflected in our response to the motion for appointment of counsel, Your Honor, it may facilitate resolution of this case going forward because we -- we have -- Mr. Schwindler and I have been dealing with each other since 2006, and there has always been an issue about his access to materials, which are considerable.

And I personally was at the prison on October 13th, sat down with the warden, Ms. Warren.  I saw -- and I have photographs of two -- the two CDs -- two of the CDs to which he's referring.  One is his CD 1.  One is -- I'm not sure if it's CD 2.  The USB port is still there.  I didn't touch it since I knew it was simply his legal materials.

29

But I think part of the problem is -- and he's alluded to it -- there are restrictions departmentwide which limit the amount of paper an inmate can have in his personal cell.  Each inmate has a locker.  They're not allowed to keep excess in their cell because of fire hazard, that sort of thing.

With Mr. Schwindler, I think we were out there in 2014 when he was litigating his civil rights case, which was complaining about the loss of his materials that it always indi- -- appeared he wanted to introduce in the habeas hearing.  These were materials relating to his claim of ineffective assistance of counsel.

The reference to the Alabama conviction, for example, it's (indiscernible) he was not challenged prior to or at his Chatham County trial, and he wanted to show that it was an invalid conviction and it should not have been used to enhance his sentence.

At one point, corrections located all of the transcripts.  There were four large Rubbermaid bins that were -- we put in the property room there at Phillips where he has been since 2013.  The habeas judge ordered that he be kept there until the completion of his state habeas case.

There were even -- they were under lock and key.  They were in the excess of the property room there at the prison.  And the state habeas judge provided the schedule

30

saying give him at least access 2 hours a week and set it out long enough in anticipation of a hearing we were going to have that fall.

Then what has happened to those since, Mr. Schwindler has given conflicting versions.  He has at times said corrections forced him to disrupt -- dismantle that system. I've been told to the contrary.

I re-sent paper copies of what we've been talking about this morning, CD-ROM 1.  That was the disc that I introduced in Gwinnett at the habeas hearing in March 2015.  It had all of the transcripts of all of the hearings that went forward in Hancock County where we put in the records from the criminal case itself.  And since my (indiscernible) broke, you can't (indiscernible) holding it up here.

This disc, I could not replicate it for Your Honor, so we sent those out.  Those have been copied onto four compact discs, which were the ones that I manually filed recently.  In anticipation of that, we sent Mr. Schwindler paper copies again of all the transcripts of all the hearings in Hancock County, which contained the records from the trial appeal.

We have filed the paper -- we filed electronic copies with Your Honor and sent paper copies of all transcripts of the evidentiary hearings in Gwinnett County (indiscernible). So the Gwinnett hearings are not part of what is on the four discs that we filed manually with the Court nor are what we

31

filed with the Gwinnett hearing in March of 2015.

The other two CDs that he refers to were materials, as he has indicated, that were provided to him by corrections independently in the course of his litigating his civil rights case complaining about access.

It was actually scheduled for a bench trial before Judge Batten in the Northern District in May of 2017. Ms. McAllister was appointed to be counsel in that case, and I think Mr. Schwindler wound up voluntarily dismissing that shortly before that proceeding went forward.

But my understanding was the Department of Corrections had independently provided him two discs of materials, one of which I tendered at the habeas hearing in Gwinnett County in February 2017.  I identified on the record of that hearing the paper copies that were on that disc and provided those to Mr. Schwindler.  In one of the recent -- the pleadings he submitted after that, he claimed he had never been provided access to them.

I did not provide him paper copies of the second disc that I was told had been provided by the civil rights lawyers to him in September 2016, but I did introduce a copy of that disc at the April 2017 hearing.

THE COURT:  Ms. Smith, let me --

MS. SMITH:  The bottom line --

THE COURT:  Ms. Smith --

32

MS. SMITH:  -- Your Honor --

THE COURT:  Ms. Smith, let me interrupt you for just one second, if I may.

When you --

MS. SMITH:  Sure.

THE COURT:  -- talk about the first and second discs in that context, do you believe that that lines up with what Mr. Schwindler has described as CD-ROM 2 and CD-ROM 3?

MS. SMITH:  Yes, Your Honor.  That was what I was trying to get to.  And so I -- in personally looking at these documents in the warden's office 2 weeks ago, I saw the disc -- what he's describing as CD 1 with all of the transcripts from Han- -- the Hancock proceedings.

There was a second disc.  I cannot specify if it's Disc 2 or Disc 3 to which Mr. Schwindler is referring.  I'll be happy to provide -- I can do either paper copies or additional copies of both of these because I have copies sitting with me now.  I'll be happy to personally take those out to Phillips State Prison and provide him access to those.

And, again, the USB port is there.  I don't know how much you want to get into about conditions of confinement or the librarian, those sorts of things, because I think the import is to go forward and try to facilitate resolution of this case because part of our position on -- if counsel would make that an easier process, then we would not oppose the

33

request of counsel just so we can move forward.

And if -- one more thing, if I may, Your Honor.  I did misspeak, and I apologize.  In Paragraph 8 of my response to his motion when I was referring to the tablets that have been provided to inmates, I was given this information and have since learned that they are not tablets like iPads capable of storing documents or Internet research.  They're essentially big Game Boys.  So I apologize for passing -- misspeaking as to that.

But otherwise, I think Mr. Schwindler pretty much has access to everything that he's described this morning, and I will be happy to provide copies again of those two discs, his -- what he's described as his CDs 2 and 3, to him, and we're -- and -- I'll stop at that, Your Honor.

THE COURT:  Thank you, Ms. Smith.  And I appreciate your candor.  You know, this is, admittedly, a complex problem, and so it needs thorough discussion.

So, just so we're clear, Ms. Smith, what Mr. Schwindler has described as CD 2 and 3, you have a set of these, and you could produce them to him, if necessary?

MS. SMITH:  Absolutely, Your Honor.

THE COURT:  Okay.  And you believe you witnessed the USB storage device already still present at the prison?

MS. SMITH:  I did, Your Honor.  And, again, I think -- yes.  And I saw two CDs.  Ms. Warren has kept those

34

for safekeeping.  They were not left in the law library so that other people could have access to them.  Everything has always been to provide Mr. Schwindler access but also safeguard his materials, which is why the (indiscernible) was put in an area of law library.

But bottom line is he has one of the two CDs, but I'll be happy to provide both to ensure he has both.

THE COURT:  So you had asked the question about whether we need to talk about conditions of confinement and what's going on at the prison at present.  Obviously, this is not set up as an evidentiary hearing, but, you know, I'm willing to certainly listen -- I'll listen to both sides.  I certainly have considered much of what Mr. Schwindler has told me, you know, about what's going on.

MS. SMITH:  If I may, Your Honor, because I -- I debated about having the warden on, but I think part of my problem is we -- this is the habeas case and focusing upon the issues in the habeas and its access to the records as developed in the state courts from his criminal trial plus the state habeas proceeding.

We have conflicting stories, conflicting information about access to the law library during COVID.  My understanding is, for example, there technically is not a librarian there.  That position was frozen.  But they've had a teacher to facilitate and provide the same services, Mr. Rickett

35

(phonetic).

I checked on the status of the computers.  The newer computers do not have the ability to afford CD review, but there is still one, and it is in working condition in the law library.  The warden and I discussed the fact that the person would have to have a password and provide access to Mr. Schwindler.  That may -- that can be accomplished.

The warden and I also discussed, because he had indicated he's pretty much following the system that was in place before, the storage of the paper copies I again provided in August are in the property room.  And we're trying to figure out a schedule for Mr. Schwindler to have access to those as well.

And corrections is obviously not interested in having another lawsuit filed, and everyone has been very cognizant of Mr. Schwindler's access and trying to provide what we can, because, as you know, they're also his legal materials, and it's not a situation where someone could inventory them apart from Mr. Schwindler himself.  And we've been given official representations.  And I appreciate his candor this morning as well.

THE COURT:  So, Ms. Smith --

MS. SMITH:  (Indiscernible.)

THE COURT:  Let me ask a few generic questions, if I may.  I presume that as COVID has gone on in general in the

36

Department of Corrections and in Phillips State Prison in particular, it has impacted where folks can go, where they can be, how they can behave, how they interact.

Is that fair?

MS. SMITH: Absolutely, Your Honor. Yes.

THE COURT: With regard to the Department of Corrections generally, though, I would presume that Mr. Schwindler is not the only person in the custody of the State of Georgia who has a substantial legal record to which he needs to gain access.

Is that fair?

MS. SMITH: That is correct, Your Honor. I -- there's another inmate who readily comes to mind in the same situation.

THE COURT: What is the general protocol or approach that the Department of Corrections takes to provide meaningful access to folks who have a large volume of material to which they need to gain access within the necessary constraints of a penal system?

MS. SMITH: I can't speak systemwide, Your Honor, but I know that Mr. Schwindler's case has sort of been a roadmap for us dealing with subsequent inmates in habeas -- state habeas corpus cases who have large records and want access to those. And a similar process has, I think, been in place. I'm aware of three or four cases in which we have been litigating.

I can't speak systemwide, and I don't want to overstate, but I do know that similar accommodations have been made for those inmates to have materials -- legal materials that are too large to be maintained in the personal cell to be kept on-site, perhaps in the property room or somewhere that it is safe and secure from (indiscernible) or other materials -- or by other people and a schedule to provide the petitioner with access to materials to (indiscernible) the pleadings is in place.

THE COURT:  And that sort of connects to the next question.  So, obviously, one of Mr. Schwindler's concerns is access to his record and his materials, but another of his concerns is his ability to meaningfully engage with legal research materials to gain access to case law statutes, compendium, hornbooks, anything that he might need, and the ability to prepare written submissions, which I have seen him to do longhand at least for the period of time that I've been dealing with the recent filings in this case.

Is there any current limitation at Phillips on his ability to be able to access legal research material?  And if so, what do you understand it to be?

MS. SMITH:  My understanding is he has the same opportunity to access as any other inmate because they -- they are -- I think -- my understanding is they are given 2 hours a week to go to the law library upon request to do legal

38

research, or they may request copies of legal materials to be provided to them.

I'll be happy -- and that's my understanding, Your Honor.  That's not something I specifically discussed with the warden.  So with the caveat -- if I am -- if I am misstating that -- and I apologize.  I would like to have the opportunity to make sure I'm giving you the correct information --

THE COURT:  Well, let me --

MS. SMITH:   -- (indiscernible).

But my understanding is everybody's had access.  And I think Phillips, based upon my understanding, has been in a little better situation than some of the other facilities in the system in that their law library has remained open during COVID, per se, without inmates necessarily being locked down.  But, again, I don't know want to overstate or misstate anything.

THE COURT:  Well, let me pivot to Mr. Schwindler on that point because, obviously, he's going to be able to tell me what his experience has been over the last couple of years.

Mr. Schwindler, you made the point in one of your recent submissions -- you provided the Court, I think, with an inventory of 65 personal computers that you identified in various locations around the prison, and you pointed out that none of those are Internet-based connected computers, as I

39

understand it.

If there is not Internet-based legal research materials, what other legal research materials are made available to you at Phillips on a regular basis, and what is the schedule of your access to them?

MR. SCHWINDLER:  What they have is they have a -- excuse me.  They have three Chromebooks that are periodically connected to the Internet, and they're in the law library. They're only open whenever education is open, which generally means they're only open about 3 hours per day if -- if they're lucky.  Today, there is no education because there's no education officer.

Phillips has experienced -- is experiencing severe staff shortages.  And that's the only way to put it, severe staff shortages.  They have the law library co-located with a college now, Truett McConnell University, so it's a little bit better whenever Truett McConnell is in session but never any more hours than what Truett McConnell is in session.

I have requested repeatedly to go to the law library. Without having a law librarian, we are directed to send our request to the deputy warden of care and treatment, and I have yet to be scheduled to go to the law library since your first order telling me to respond.  I haven't been able to go.

I've spoken directly to the warden about it.  He has said he will make sure that that happens.  But it is very

40

much like the warden has told them to give me access to these papers.

And he said, "Okay. We're going to use the old schedule that we used to use. You can go up there every Friday for 2 hours and have access." And that has yet to happen.

And when I go up there, I have, on more than one occasion, stood outside the ID room waiting for permission to come in only to be told, after 2 and a half hours, to go back to the dorm. It's not that the warden doesn't want to cooperate. It's that he doesn't have any officers to man these particular locations.

So the reality is -- is that what used to work quite well back in 2017 where I had all this stuff electronically and I could go to the law library and I could go to the hornbooks and I could go to the Shepardized cases and I could refer to the materials and go back over -- that worked quite well.

But it doesn't work anymore because of -- as Ms. Smith said, we don't have the ability to read these on these other computers. And I just don't know of any solution to the problem because -- the dorm that I am in is one of the working dorms. We've had three different officers assigned to that dorm today because of staff shortages, one staying from last night. One was a sergeant. And there's now a different sergeant there now.

This has been the problem. And it's both COVID, and

41

it's the staffing shortages and all the rest.  We have a dorm in our building now that is locked down on COVID again, so we're fixing to go through that again.

Access is just -- I haven't seen the paper stuff; I can't use the electronic stuff; and I can't get in the law library.  Other than that, it's great.

THE COURT:  All right.  Ms. Smith, I'm going to quote a line to you from your response brief in this case. Specifically, it's on Page 2 of your brief in Paragraph 3.

You write, quote, Respondent does not oppose the appointment of counsel as a matter of the Court's discretion, though Respondent does not admit that due process or the interests of justice would require the appointment of counsel in this case.

I understand that to be the Department of Corrections' position, the warden's position in this matter. Obviously, mere convenience or ease with which the case might go forward if Mr. Schwindler were represented by counsel is probably not enough as a legal standard.  I think it's probably beyond dispute that Mr. Schwindler's cause might be aided by a lawyer, but I just don't know if that's enough for me to exercise my discretion.

If the position of the respondent is that counsel is not required in this case because it denies that there has been or continues to be any due process violation, what maneuver

42

ground do I have left to me to exercise discretion?  What discretion do you think I ought look to if I were inclined to grant this request?

MS. SMITH:  I think I've been doing this too long, Your Honor.  In looking at just starting out as a federal habeas lawyer and knowing that Your Honor had broad discretion, I think, under some of the pre-AEDPA and the changes when the federal death penalty statute was enacted, I think it maybe tightened up some of your ability to appoint counsel, and I think that has colored some of it.

Obviously, I would be reluctant to admit there's a due process violation because that would turn around and potentially subject corrections to liability.  My understanding is I think you have the discretion to appoint counsel, and perhaps it might fall under more of the interest of justice. I know -- particularly given the fact that I've had conflicting information from Mr. Schwindler about his position and his access so many times over the years.

But at the end of the day, we're just simply trying to -- we just want to move forward and, again, as we said, try to get the focus of this case back on the habeas issues and away from attendant situations.  And perhaps in the interest of justice, that might be the (indiscernible) upon which counsel could be appointed, because even if the scenario -- if giving Mr. Schwindler weekly access, how long would it take to get him

43

back up to speed to be able to file a response even though these are his grounds -- and one thing I had neglected to point out is he has been actively involved in the litigation of this case even in the criminal case.

He was allowed to file a pro se brief in the Georgia Court of Appeals, which is an extraordinary event, to act as co-counsel. His grounds were, in fact, considered. So he has been actively plowing his criminal case almost from the outset for potential issues. It's not as if drawing up a federal petition was something new.

But at the end of the day, it may be that the appointment of counsel -- given his health conditions, given the impact of COVID, given the impact of where we are, it may be that, just in the interest of justice going forward, it would be a basis upon which to appoint counsel because I think counsel could probably come up to speed quicker and would not have the access or -- because, as we know, if you give one person extra, then another person who can't occupy that 2-hour slot at a computer, then they may have some reason to complain. And it is a balancing act, Your Honor, as I'm sure you're obviously aware.

THE COURT: All right. Thank you, Ms. Smith.

We've been going about an hour. I'd like to take a brief recess and just consult my notes. I'm not sure, frankly, how much more inquiry I may have. We may have reached sort of

44

a natural conclusion, but I want to reflect on that and just take a short break, and then I'll return to the bench and see where we are. Until then, we're just going to stand in recess.

I would ask those of you on the video to please just stay on the line. Do not hang up. Do not go away. Keep the line connected, and I'll return to the bench shortly.

(A recess was taken from 10:14 a.m. to 10:19 a.m.)

THE COURT: All right. We are back from our recess in the matter of Schwindler versus the warden.

I don't know that I have any additional specific questions for either of the parties this morning, but I will afford each side an opportunity to make any final remarks they may wish to make before we conclude this hearing.

Mr. Schwindler, since this is your motion, I'll hear from you first.

MR. SCHWINDLER: Your Honor, I really think that it's in everybody's best interest -- it's in the prison system's best interest. I think it's in the State's best interest, the Court's best interest, and my best interest to have counsel.

I really think that this case needs to move forward. It's gone on way too long. I don't feel like fighting anybody anymore. I am to the point where I want it to come to an end. And, in fact, at one point, I even said I'll dismiss the case. The heck with it. Just let us (indiscernible). And, you know, I'm to the point where I really think that it is in the best

45

interest of every single person that's involved with this to have counsel.

THE COURT:  All right.  Very well.  Thank you, Mr. Schwindler.

Ms. Smith, anything on behalf of the respondent?

MS. SMITH:  We have nothing further, Your Honor.

THE COURT:  All right.  Mr. Schwindler, Ms. Smith, I appreciate your time this morning, and I appreciate you answering the Court's questions and amplifying my understanding of the issues through this process.  Video has become a useful tool in that respect, and I think we've made good use of it this morning.

I will take the petitioner's motion to appoint counsel under -- or, in the alternative, extend his time in which to respond under advisement, and I will issue a ruling in due course.

This concludes this hearing.  We're going to go off the video and off the record.  Please have a nice day, and everyone please . . .

(Proceedings concluded at 10:21 a.m.)

46

C E R T I F I C A T E

     I, Victoria L. Root, Certified Court Reporter, in and for the United States District Court for the Southern District of Georgia, do hereby certify that the foregoing transcript of the proceedings held in the above-entitled matter was transcribed to the best of my ability from the Court's electronic recording system and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

     WITNESS MY HAND AND SEAL this 31st day of December, 2021.


_____
VICTORIA L. ROOT, CCR B-1691
United States Court Reporter
Southern District of Georgia
Savannah Division


Post Office Box 10552
Savannah, Georgia  31412
(912) 650-4066